UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **MARGARET KRODEL** | : |
| Plaintiff | : CIVIL ACTION NO: 3:21-cv-1136 |
| V. | : |
| **UNITED PARCEL SERVICE, INC.** | : |
| Defendant | : OCTOBER 22, 2021 |

## AMENDED COMPLAINT

## COUNT ONE:  RETALIATION IN VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT ("CFEPA") Conn. Gen. Stat. § 46a-60(b)(4) (Retaliation)

    1.    Plaintiff, Margaret Krodel a/k/a Meg Krodel, resides at 88 Bashon Hill, Bozrah, Connecticut 06334 and she is a 64-year-old white female (DOB: 11/3/1956).

    2.    Defendant, United Parcel Service, Inc., is a foreign corporation having corporate headquarters at 55 Glenlake Parkway, NE, Atlanta, Georgia 30328, and an agent for service in Connecticut identified as Corporation Service Company, 100 Pearl Street, 17th Floor, MC-CSC1, Hartford, Connecticut 06103.

3. Defendant, United Parcel Service, Inc. ("UPS"), holds itself out to be the world's largest package delivery company powered by more than 450,000 employees. (https://www.ups.com/us/en/about.page).

4. At all times relevant hereto, the Defendant owns and operates a distribution center located at 180 Fitchville Road, Bozrah, Connecticut 06334.

5. Upon information and belief, the Defendant has more than one hundred (100) employees in the State of Connecticut and more than seventy (70) employees working at the Bozrah location identified immediately above.

6. The acts and/or omissions of the Defendant and its agents, representatives, managers and/or decision-makers as set forth more fully below occurred in the scope and in the course of employment and, as such, were engaged in on behalf of UPS.

7. Ms. Krodel was employed by the Defendant in its Bozrah, Connecticut distribution center for approximately twelve (12) years, when she was wrongfully terminated on January 8, 2020 for speaking up to a supervisor about being singled out because of sex. Her most recent position held is Preloader.

8. Following an arbitration proceeding, through the grievance process outlined in the applicable collective bargaining agreement, Ms. Krodel was returned to work on August 10, 2020 and her time out of work (seven months) was deemed a disciplinary, unpaid suspension.

9.     Despite being fully aware of the discrimination and harassment that Ms. Krodel has endured, which led to her speaking up to a supervisor and the termination, Defendant returned Ms. Krodel to the same harassing work environment that she was enduring prior to her termination.

10.     Prior to the January 8, 2020 termination, Ms. Krodel was a part-time employee in the Bozrah distribution facility, working first shift (early mornings) 26-30 hours, six (6) days per week.

11.     Since returning to work on August 10, 2020, Ms. Krodel is still a part-time employee in the Bozrah distribution facility, working first shift (early mornings) but now she works 20-25 hours per week, five (5) days per week.  Ms. Krodel rarely works Saturdays because she cannot tolerate certain harassing individuals on that shift, even though the work is available and was offered to her upon her return.

12.     The distribution center where Ms. Krodel works is warehouse-like and is staffed predominately with male managers, supervisors, and co-workers. Ms. Krodel is one (1) female of approximately only five (5) females who work the first shift in the warehouse.

13.     Sexually vulgar and offensive language is consistently used amongst managers, supervisors and employees in the warehouse on a daily basis.  Male employees are permitted by managers and supervisors, who are present in the

warehouse, to play music with lyrics that are vulgar, offensive and derogatory to female employees loudly while at work.

14.     For approximately five (5) years prior to the termination, and continuing to the present, Ms. Krodel has been subjected to a severe and pervasive hostile work environment based on sex on a near-daily basis, while working for the Defendant.

15.     A union steward, and a co-worker of Ms. Krodel, Christopher Lawton ("Lawton"), generally speaks aloud in the workplace about the female employees, referring to them as old, fat and/or lazy and stating that he wished that younger, more attractive females worked there.

16.     Lawton has relentlessly targeted and taunted Ms. Krodel, in particular, by referring to her as the "Queen" (stating phrases to the effect of "Here comes the Queen" when she entered a workspace); yelling at her; and calling her a "bitch" and a "cunt" behind her back and directly to her.

17.     Lawton spoke with her full-time supervisor, Rich Krepcio, about Lawton's harassing comments on a number of occasions, and her supervisor's response to her is and had repeatedly been for her to "ignore him, he's just a jerk" or words to that effect. Despite raising her complaint to her supervisor, Lawton's harassment has been permitted to continue unaddressed and/or resolved by the Defendant.

18.     A friend of Lawton (Lori Salter) spoke to other employees in the workplace, at one point, referring to the Ms. Krodel as a "coke whore" and Ms. Krodel complained

directly to the Center manager at the time (Chris Paquette) about the statements. Paquette's response was, "Meg, I don't believe everything that I hear . . ." confirming (1) that he was aware of the name-calling in the workplace; and (2) insinuating that he did not believe the statement and/or Ms. Krodel to be a whore hooked on cocaine; yet, he did nothing to stop the harassment in the workplace and it continued.

19.     In or about December, 2018, Lawton whittled a penis out of a large piece of Styrofoam and was showing others in the workplace. Ms. Krodel spoke up to a supervisor (Joe Lecce) who was walking by at the time about the Styrofoam penis but he just walked by, doing nothing to stop the conduct.  A co-worker (Corey Hackett) threw the penis on the "red" belt and it went down the conveyor belt to a female co-worker (Renee). Upon information and belief, the female co-worker (Renee) wrote a letter to the Defendant regarding the incident at that time.

20.     Ms. Krodel spoke up again about Lawton's harassing conduct in the workplace in or about April 2019, when Lawton threw a bag over the side railing from upper level to lower level hitting her in the shoulder.  She reported the incident to Human Resources immediately when it occurred, but the Defendant did nothing to promptly look into the allegation, such as secure the video footage from the work area and question all employees working in the area at that time.  Defendant's response to her complaint was to say "we know that he did it but we cannot prove it" and to tell her to "stay away from Lawton."   No action was taken against Lawton.

21.    Following that incident, Ms. Krodel felt further targeted by Lawton for complaining to Human Resources, as his conduct did not cease but instead continued on a near-daily basis. Ms. Krodel began fearing work because she knew she would have to continue to endure his harassment.

22.    Lawton would block her path when she was walking, which was intimidating, embarrassing, demeaning and aggressive, and would whisper "bitch" or "cunt" to her in a threatening manner as she tried to get around him.

23.    A number of occasions arose in April through June 2019 that Ms. Krodel feels Lawton orchestrated by filing complaints against Ms. Krodel, in order to antagonize Ms. Krodel and/or paint Ms. Krodel in a negative light because she had just complained about his conduct earlier in April, when he dropped a bag on her.

24.    Ms. Krodel repeatedly reported Lawton's conduct to her direct supervisor, but still was told simply to ignore it and nothing further was done to eliminate Lawton's behavior from the workplace.

25.    Ms. Krodel is a single female who relies on this job because she needs the wages and benefits to provide for herself so she has had no choice but to endure the sex-based hostile work environment or else be out of a job and without a source of income and benefits.

26.    On or about December 6, 2019, while at work and facing another day in the Defendant's harassing work environment, with Lawton badgering her, Ms. Krodel had a

panic attack due to the stress of the environment, requiring medical treatment at the hospital. She left work early using her own leave time to get out of the workplace.

27. Every Saturday in 2019 that Ms. Krodel worked scanning items with a male co-worker named Andrew Wisniewski, including but not limited to Saturday, December 7, 2019, Wisniewski would ogle her body as she worked, asking her questions such as "Meg, how big is your rack?" or "What size is your rack, Meg?" referring to her breasts. He told her to "drop something" and "bend over to pick it up, so I can check out your ass." He commented on the looseness of her clothing (shirts/pants) (e.g. "Meg, those pants you are wearing are too loose, I cannot see your ass" or words to that effect). Furthermore, he would ask her to lift up her shirt so he could see her "tits." Female co-worker (Denise, who only worked Saturdays in Bozrah but worked regularly in Niantic) was present on at least one occasion and witnessed Wisniewski's comments to Ms. Krodel. Denise indicated to the Ms. Krodel that it was offensive and Ms. Krodel should make a complaint.

28. Ms. Krodel finds Wisniewski's conduct to be repulsive and disgusting, and she dreads working Saturdays because of Wisniewski. Ms. Krodel did in fact report Wisniewski's conduct to supervisor, Cody White, in or about December 2019, but nothing was done to end the conduct and Ms. Krodel was forced to continue to endure the same.

29. Defendant's managers are well-aware of the harassment that Ms. Krodel endured for so long but have done nothing about it.

30.    There was an incident on or about December 20, 2019 when work in the warehouse was at a lull.  Ms. Krodel had followed supervisor Rich Krepcio's directives to get the area ready for business (e.g. change the labels, pick up the area, etc.) and then she proceed upstairs to keep busy by checking with Gerry Krzywicki to see if he needed any help, just as she had for ten (10) or so years when her area was slow because she was trained to do the work in Krzywicki's area also.

31.    Co-worker Ben Algiere (male) was already up there in Krzywicki's area, despite being assigned to the "preload" area just like Ms. Krodel.  Algiere was up there talking with the other male employees.

32.    As soon as Ms. Krodel walked up to that area, co-workers Hackett and Lawton were standing on the opposite side of the room and Lawton start yelling "too many people up here, someone needs to go" or words to that effect, specifically referring to her, the Ms. Krodel.  Hackett and Lawton then yelled for the part-time supervisor (Cody White) to come upstairs, which he did.  When White arrived upstairs, he proceeded over to speak with Hackett and Lawton, before proceeding directly over to Ms. Krodel.  White directed Ms. Krodel to leave the area and go back downstairs to work.

33.    Ms. Krodel was upset and frustrated, and she questioned the directive from White to return downstairs by asking "why," to which White responded, "to set up for work." Ms. Krodel had already done the necessary tasks before walking upstairs and there was no work to be done, which is why she had gone upstairs in the first place – to find work

that could be done.  Furthermore, Algiere (male) was standing right there not performing any tasks but he was not asked to return to his designated work area.  In fact, all the employees (all male) upstairs at that time were standing around talking because there was no work.  Neither Algiere (who is assigned to the same area as Ms. Krodel) nor any other employee (all male) was directed out of the area and back to work.

34.    Ms. Krodel complied with White's directive and followed him downstairs, where she asked him again why she was not "allowed" upstairs and told him that he was singling her out.  Out of frustration with the constant harassment by Lawton, and White banishing her back downstairs on Lawton's command when no other employees (all males) were allowed to stand around upstairs talking, Ms. Krodel stated "why the fuck am I being singled out?" or words to that effect.

35.    Ms. Krodel was summoned to a meeting with Jordan Deller, Northeast District Training Manager, on or about January 8, 2020, without warning.  A co-worker, Bryce Dietz, retrieved Ms. Krodel from the warehouse around 8:00 a.m. that morning and attended the meeting with Ms. Krodel and Deller.

36.    Prior to the January 8, 2020 meeting, Deller had obtained a written statement from White (male) but not from Ms. Krodel (female). Ms. Krodel was fired for insubordination for speaking up to White about being singled out on December 20, 2019.

37.    A January 13, 2020 letter provided to Ms. Krodel reflecting her termination stated that she was terminated for failure to follow company policies, methods and

procedures, insubordination, and violating the UPS Professional Conduct and Anti-Harassment policy (which Ms. Krodel, at that time, had never seen previously). That reason was inaccurate, as Ms. Krodel was fired for speaking up against being singled out, which not only was an adverse employment action, but one part of a continued pattern of discriminatory and/or severe and pervasive hostile treatment based on sex in the workplace. Thus, Defendant's characterization of her termination was pretext for discrimination and/or retaliation against Ms. Krodel for speaking up about the disparate treatment she was facing in that moment.

38.     Defendant terminated Ms. Krodel for questioning a directive that was discriminatory on its face.

39.     Defendant's termination of Ms. Krodel was without just cause, as Ms. Krodel was conducting herself in the workplace in the manner condoned by management for male employees, except that she is female and a different standard was applied to females.

40.     The severe and pervasive sexual harassment of Ms. Krodel continued even after she was terminated from Defendant, when on or about February 5, 2020, she received a disgusting, vulgar, and humiliating text message and photo on her personal cellphone.

41.     The February 5, 2020 text message first stated "Hey [M]eg, can you accept photos?  I need to see if this is a UPS package."

42.    Although Ms. Krodel did not recognize the telephone number on the text message, she had only recently left employment with UPS and was unsuspecting that the text was from anyone other than someone she knew from UPS who needed assistance identifying a UPS package, so she replied "Yes."

43.    Ms. Krodel then received via text message a vulgar naked "selfie" of an erect penis and scrotum. This was embarrassing, humiliating and intimidating, as the Ms. Krodel felt very unsafe, vulnerable, and targeted, even outside the workplace.

44.    Despite having been fired from Defendant, she reported the incident to the Defendant via email (DHagi@ups.com) on February 18, 2020, after conferring with the police, her union representative and her attorney.  Defendant did not even acknowledge the email or the incident.

45.    In or about October 2019, a female co-worker (Seraph Weiss) had also received a text message very similar to the one Ms. Krodel received (substantially similar photo) but she did not report it to Defendant, given the unlikelihood that Defendant would do anything about it.

46.    On or about February 20, 2020, Ms. Krodel sought therapy for the mental health symptoms she was experiencing as a result of Defendant's acts and/or omissions with respect to providing her a safe workplace.

47.    Ms. Krodel was diagnosed with Unspecified Trauma and Stressor Related Disorder, and has since been diagnosed with Post-Traumatic Stress Disorder ("PTSD")

as a result of the significant distress and workplace trauma she has endured working in the Defendant's workplace.

48.    Ms. Krodel was out of work from January 8, 2020 through August 10, 2020, nearly seven months without pay or benefits, due to the termination.

49.    On or about August 10, 2020, Defendant reinstated Ms. Krodel following her exercise of grievance rights under her union contract, through the arbitration process, on the basis of lack of "just cause" for her termination.

50.    Through the grievance process, which included meetings with Defendant's management and human resources personnel, Ms. Krodel explained the sexually harassing severe and pervasive work environment that she was enduring and that she was fed up with having to work in those conditions; she explained that Lawton was targeting her and causing a severe and pervasive hostile work environment for her based on sex.

51.    Ms. Krodel's co-workers (Ben Algiere, Theodore Rahmann, Sarah Rubino, and Seraph Wise) have all spoken up via written statements regarding the discrimination and harassment that Ms. Krodel (and other females) have been forced to endure in Defendant's workplace, and they expressed fear of retaliation for doing so.

52.    On or about August 10, 2020, Ms. Krodel was returned to her same position following the conclusion of the grievance arbitration process but was not provided with back pay for the seven months she was wrongfully out of work, and her health insurance

benefits are not restored until November, 2020 so she is forced to pay out of pocket for health benefits until such time. She was also denied certain pension credits during the time she was wrongfully out of work.

53.     On or about August 10, 2020, despite having knowledge of the severe and pervasive discriminatory hostile work environment that Ms. Krodel is subject to, Defendant simply returned her to work in the same severe and pervasive hostile work environment.

54.     The Defendant failed this employee by fostering a severe and pervasive work environment aimed at her gender/sex and when she could not take it anymore and she stood up for herself, and Defendant fired her.

55.     Defendant then put her right back into the same discriminatory work environment with Lawton and others, who immediately returned to their harassing conduct.

56.     The second week that Ms. Krodel was back at work, Lawton's retaliatory and harassing campaign against her resumed.  He walked by and intentionally coughed on her multiple occasions during the ensuing COVID-19 pandemic; he stared and glared at her, posturing to spit on her during the COVID-19 pandemic; he has been jumping over the conveyor belt to get away from her in a flagrant and demeaning manner; and Ms. Krodel cannot move about the warehouse without having someone accompany her so that Lawton doesn't target and harass her.

57. Ms. Krodel reported all of this to the Defendant's management and personnel department.

58. Ms. Krodel still fears going to work every day since her return to work on or about August 10, 2020, and she continues to require medical treatment (therapy) to deal with the emotional distress the Defendant has caused her.

59. She continues to work for Defendant because she is a 64-year-old female who relies upon the wages and benefits of the job to survive; yet working there is causing her physical and emotional harm because of the discriminatory work environment that Defendant continues to foster.

60. Ms. Krodel has spoken up to her supervisor, Rich Krepcio, multiple times since returning on August 10, 2020 and was told that she would not have to interact with Lawton; however Lawton disregards the directives (for e.g. that he not work on high-value items so as to eliminate interaction) and confronts her while she is working on such items, staring at her to intimidate her.

61. On or about August 26, 2020, Ms. Krodel broke down at work crying because of the severe stress working with Lawton is continuing to cause her and she spoke about it to her supervisor, Rich Krepcio. Upon information and belief, the result was that Lawton was told to leave her alone. However, Ms. Krodel's work location was involuntarily moved away from where she used to work, while Lawton was permitted to work in his position unchanged and without repercussion for his conduct.

62.    Following Ms. Krodel's return to work and her speaking up again to management about the ongoing hostile work environment, as well as filing a charge with the CHRO/EEOC, in or about November, 2020, Ms. Krodel and a co-worker (Seraph Weiss) who was identified in the CHRO/EEOC charge as a witness to the harassment and retaliation in the workplace, both received a vulgar text message (photo of erect male genitals) that mentioned Seraph in the text to Ms. Krodel, forming a direct nexus between the harassing action and the workplace.   Though it was reported to the Defendant, Defendant did nothing in response.

63.    The symptoms of Ms. Krodel's PTSD have been significantly exacerbated since her return to work on August 10, 2020 and her return to the hostile work environment.   Continuing to work for the Defendant in this environment is causing her physical and mental harm.

64.    Defendant has failed to uphold its obligations to provide a safe working environment for Ms. Krodel.

65.    Upon information and belief, Defendant does not maintain a written anti-discrimination and/or anti-sexual harassment policy.   Upon information and belief, it has not notified its employees of and/or trained its employees on the contents of these policies.  In any event, should such policies exist, they are disregarded by employees and supervisors and have been since the Ms. Krodel began working there approximately twelve (12) years ago.

66.     Upon information and belief, Defendant has not provided sexual harassment prevention training to its employees, to include the Ms. Krodel, either prior to October 1, 2019 or since.

67.     In the course of Ms. Krodel's termination grievance proceedings in or about August 2020, she was provided for the first time with what purports to be a workplace violence policy and a UPS Professional Conduct and Anti-harassment Policy, neither of which she was ever shown prior to her termination, nor does she know where such policies are maintained at the Bozrah facility.  A review of said policies indicates that, even if the policies exist, the Defendant has certainly not followed its own policies with respect to the treatment of Ms. Krodel in the terms and conditions of her employment with Defendant.

68.     At all relevant times, Ms. Krodel has performed her position with the Defendant in a satisfactory manner and has not been subject to disciplinary action, until the day she was terminated in January of 2020 for speaking up about being singled out.

69.     Ms. Krodel filed a timely complaint with the Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC") on October 1, 2020 and received a Release of Jurisdiction on April 30, 2021 (Ex. A).

70.     Ms. Krodel timely served the Defendant her July 27, 2021 initial Complaint in this matter within ninety (90) days of her receipt of the Release of Jurisdiction and

within two (2) years of the filing of her complaint, satisfying all administrative pre-requisites to bringing this cause of action in court.

71.     Defendant is an employer with three or more persons in its employ within the meaning of Conn. Gen. Stat. §46a-51(10) and is subject to the CFEPA.

72.     It shall be a discriminatory practice in the State of Connecticut, in violation of Conn. Gen. Stat. § 46a-60(b)(4), for any person, employer, labor organization, or employment agency to discharge, expel, or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint.

73.     In speaking up to her managers about the sex discrimination in the workplace, and being fired for it, Ms. Krodel was retaliated against by the Defendant in violation of Conn. Gen. Stat. § 46a-60(b)(4).

74.     The severe and pervasive hostile treatment that Ms. Krodel received from co-workers, to include Lawton, on a continuing basis when she returned to work in or about August 2020 changed the terms and conditions of her workplace, and constitutes retaliation against Ms. Krodel by the Defendant in violation of Conn. Gen. Stat. § 46a-60(b)(4).

75.     That Ms. Krodel was involuntarily transferred away from her work location in or about September 2020 when she spoke up about the continuing retaliation she

was forced to endure constitutes retaliation by the Defendant in violation of Conn. Gen. Stat. § 46a-60(b)(4).

76.     Since the Defendant was served with the initial Complaint in this case, on July 28, 2021, Ms. Krodel has been repeatedly subjected to additional acts of sex discrimination, sexual harassment and retaliation in the workplace.

77.     On or about August 17, 2021, male co-worker, Paul Irons, threw a metal roller down the stairs into her area in rage.  The act was so aggressive that upon impact, the roller was destroyed.

78.     This severe aggression in the workplace in her work area caused extreme stress and anxiety and fear for Ms. Krodel that she needed to leave work.  She reported this instance to her supervisor.

79.     The next week, on or about August 26, 2021, supervisor Joe Reels threw two (2) rollers and was banging his head against the side of the truck in an aggressive and hostile manner.  Again, the stress and anxiety and fear that Ms. Krodel felt in the workplace required her to leave work and she reported the instance to her supervisor.

80.     Upon information and belief, Defendant did nothing in response to these two situations.

81.     These two instances of hostile and aggressive behavior not only exacerbated the symptoms of Ms. Krodel's workplace-caused PTSD, the Defendant's lack of response constitutes additional instances of gender discrimination, whereas Ms.

Krodel was terminated and subject to lengthy suspension for speaking up in frustration about being singled out, and male employees are repeatedly allowed to act with aggression and hostility without consequence.

82.    On or about September 8, 2021, Ms. Krodel was informed by co-workers that a copy of her July 27, 2021 Complaint had been printed out and was being circulated in the workplace.  Defendant's employees are approaching her and individual witnesses identified in her complaint, and questioning them about it, causing hostility in the workplace for her and others directly due to the exercising of protected activity.

83.    In fact, co-worker Lori Selter, walked up behind Ms. Krodel on or about September 10, 2021 and called her a "coke whore," which is an allegation in Ms. Krodel's July 27, 2021 Complaint that Ms. Selter is repeating in the workplace despite Ms. Krodel's prior complaints.

84.    Ms. Krodel reported the issues to her supervisor, Rich, and was informed by him that "it is public knowledge, this is what happens" or words to that effect, which Ms. Krodel took as demonstration of Defendant's acquiescence in the continued harassment and retaliation for their protected activity.

85.    Ms. Krodel also reported this situation to upper management, Luis.

86.    As a direct result of the severe emotional distress of the on-going sex discrimination, sexual harassment, and retaliation, Ms. Krodel required a medical leave

of absence from September 15, 2021 to September 27, 2021 to deal with the exacerbated symptoms of her PTSD.

87.    Nonetheless, she constantly lives in real, constant fear of what harassment or retaliation she will face each day that she reports to work, a job that she needs for health insurance and retirement benefits, and the wages.

88.    On or about October 11, 2021, when Ms. Krodel arrived at work at approximately 5:45 a.m., in her workspace someone had placed feces (appeared to be human fecal matter) on the floor with a piece of plastic which appeared to have been used to hold it.

89.    Ms. Krodel immediately reported this to her supervisor, Rich Krepcio, and to Diane Hagi of Human Resources.  Her supervisor did not come into the area to witness the situation, but instead sent Cody White down to remove the feces.

90.    Upon information and belief, Defendant has done nothing to investigate the situation despite the existence of video surveillance camera footage of the area, which Ms. Krodel immediately requested be preserved.

91.    The severe and pervasive hostile treatment that Ms. Krodel has continued to receive from co-workers, and the acquiescence of Defendant's supervisors to the same, on a continuing basis since Ms. Krodel filed her July 27, 2021 Complaint, constitutes retaliation as a term and condition of her workplace, and illegal retaliation against Ms. Krodel by the Defendant in violation of Conn. Gen. Stat. § 46a-60(b)(4).

92.     Ms. Krodel has been caused to suffer damages as result of retaliatory actions of the Defendant in the form of lost wages and benefits, future pay and benefits, emotional distress, non-economic damages and attorneys' fees.

## COUNT TWO:  SEX DISCRIMINATION IN VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT ("CFEPA") Conn. Gen. Stat. § 46a-60(b)(1) (Gender/Sex Discrimination)

1-71.   Paragraphs 1 through 71 of Count One are repeated and re-alleged as if set forth fully in this Count Two.

72.     It shall be a discriminatory practice in violation of Conn. Gen. Stat. § 46a-60(b)(1) for an employer, by the employer or the employer's agent, to discriminate against any individual in the terms, conditions, or privileges of employment because the of the individual's sex.

73.     Since filing her July 27, 2021 initial Complaint in this litigation, on or about August 17, 2021, male co-worker, Paul Irons, threw a metal roller down the stairs into her area in rage.  The act was so aggressive that upon impact, the roller was destroyed.

74.     This severe aggression in the workplace in her work area caused extreme stress and anxiety and fear for Ms. Krodel that she needed to leave work.  She reported this instance to her supervisor.

75.     The next week, on or about August 26, 2021, supervisor Joe Reels threw two (2) rollers and was banging his head against the side of the truck in an aggressive

and hostile manner.  Again, the stress and anxiety and fear that Ms. Krodel felt in the

workplace required her to leave work and she reported the instance to her supervisor.

76.     Upon information and belief, Defendant did nothing in response to these

two situations.

77.     These two instances of hostile and aggressive behavior not only

exacerbated the symptoms of Ms. Krodel's workplace-caused PTSD, the Defendant's

lack of response constitutes additional instances of sex discrimination, whereas Ms.

Krodel was terminated and subject to lengthy (seven month) suspension for speaking

up in frustration about being singled out in the workplace, yet male employees are

repeatedly allowed to act with aggression and hostility without consequence.

78.     On or about August 24, 2021, Ms. Krodel received a text message of

sexually harassing from a co-worker that stated "you look hot today" together with a

winking emoji.  Ms. Krodel reported it to management, providing the telephone number

from which it derived.

79.     Approximately two weeks later, Ms. Krodel received another harassing

text message from the same telephone number but this time it was sexually harassing

and directly related to her filing of the initial complaint in this matter.

80.     The text message read "I will take your side if you help me out" with a

winking emoji, which Ms. Krodel took to mean that if she performed sexual favors to this

individual, he would take her side.  She again reported it to management (Luis), who

confirmed that Defendant was aware of who the phone number belongs to (Andrew Beatty), a UPS employee who works upstairs from Ms. Krodel, with Christopher Lawton.

81.     Despite management's apparent knowledge of who sent the sexually harassing text message to Ms. Krodel on or about August 24, 2021, Defendant did nothing to eliminate the harassment from the workplace.  Upon information and belief, Mr. Beatty continues to work for UPS, Inc. today without consequence for his actions.

82.     In subjecting Ms. Krodel to a long-standing, on-going sexually-charged severe and pervasive hostile work environment, and failing to properly investigate and/or take prompt, swift and appropriate action to effectively remedy the work environment for Ms. Krodel, despite her repeated complaints to supervisors and/or Human Resources about the terms and conditions of her employment, the Defendant has discriminated against Ms. Krodel in the terms, conditions and privileges of employment because of her sex, in violation of Conn. Gen. Stat. § 46a-60(b)(1).

83.     Ms. Krodel has been caused to suffer damages as result of the discriminatory actions of the Defendant in the form of lost wages and benefits, future pay and benefits, emotional distress, non-economic damages and attorneys' fees.

**COUNT THREE:  SEXUAL HARASSMENT IN VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT ("CFEPA") Conn. Gen. Stat. § 46a-60(b)(8) (Sexual Harassment)**

1-71.   Paragraphs 1 through 71 of Count One are repeated and re-alleged as if set forth fully in this Count Three.

72.     It shall be a discriminatory practice in violation of Conn. Gen. Stat. § 46a-60(b)(8) for an employer, by the employer or the employer's agent, to harass any employee on the basis of sex.

73.     Sexual harassment is defined in Conn. Gen. Stat. § 46a-60(b)(8) as any unwelcome sexual advances, or requests for sexual favors, or any conduct of a sexual nature when submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or such conduct has the purpose of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

74.     Corrective action by an employer shall not modify the conditions of employment of an employee making a claim of sexual harassment, unless the employee agrees to such modification in writing.

75.     Ms. Krodel has  been subjected to overt and vulgar sexual harassment in the workplace on a nearly daily basis for many years, and the Defendant, through its supervisors and human resources departments is aware of the sexually harassment work environment that Ms. Krodel is forced to work in.

76.     Ms. Krodel spoke up in rejection of unfavorable treatment based on sex in or about December, 2019 to her supervisor, and she was fired for rejecting the unfavorable treatment based on sex.

77.     Ms. Krodel was eventually returned to work following such termination, but she was forced to continue to endure the same sexually harassing environment, which was now fueled by additional animus against her for her complaints about the work environment.

78.     Ms. Krodel complained to her supervisor about the working conditions in or about August 2020, and she was moved away from her work location while the primary perpetrator of the harassing and discriminatory conduct, Lawton, was allowed to remain in their work location and allowed to continue on working, unaffected.

79.     Since Defendant was served with Ms. Krodel's July 27, 2021 Complaint in this litigation, on or about August 24, 2021, Ms. Krodel received a text message of sexually harassing from a co-worker that stated "you look hot today" together with a winking emoji.  Ms. Krodel reported it to management, providing the telephone number from which it derived.

80.     Approximately two weeks later, Ms. Krodel received another harassing text message from the same telephone number but this time it was sexually harassing and directly related to workplace protected activity, her filing of the initial complaint in this matter.

81.     The text message read "I will take your side if you help me out" with a winking emoji, which Ms. Krodel took to mean that if she performed sexual favors to this individual, he would take her side in her litigation.  She again reported it to management

(Luis), who confirmed that Defendant was aware that the phone number belongs to a UPS employee (Andrew Beatty), who works upstairs from Ms. Krodel, alongside Mr. Lawton.

82.     Despite management's apparent knowledge of who sent the sexually harassing text message to Ms. Krodel on or about August 24, 2021, Defendant did nothing to eliminate the harassment from the workplace.  Upon information and belief, Mr. Beatty continues to work for UPS, Inc. today without consequence for his actions.

83.     Defendant is aware of the sexual harassment in the workplace and does nothing to eliminate the same, instead fostering the harassing environment.

84.     Submission to sexual harassment in the workplace is explicitly or implicitly a term and a condition of Ms. Krodel's employment with the Defendant.

85.     The sexual harassment in the workplace has the purpose or effect of substantially interfering with Ms. Krodel's work performance.

86.     The sexual harassment in the workplace is intimidating, hostile and offensive, and as such, constitutes an enduring work environment for Ms. Krodel that is intimidating, hostile and offensive.

87.     Ms. Krodel has been caused to suffer damages as result of retaliatory actions of the Defendant in the form of lost wages and benefits, future pay and benefits, emotional distress, non-economic damages and attorneys' fees.

**COUNT FOUR:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

1-92.  Paragraphs 1 through 92 of Count One are repeated and re-alleged as if set forth fully in this Count Four.

93.     The Defendant's conduct extends beyond the bounds of decency acceptable in any place of employment in that the Defendant endorses a work environment rampant with intimidating, hostile and offensive sexual harassment, sex discrimination, and retaliation targeting Ms. Krodel.

94.     The terms and conditions of Ms. Krodel's employment are so provocative and destructive to Ms. Krodel that any reasonable employer would have taken precautions to ensure her safety and well-being at work, knowing that being subjected to such an adverse work environment would cause emotional distress.

95.     The Defendant's extreme and outrageous conduct was intended to cause Ms. Krodel severe emotional distress.

96.     Ms. Krodel has been caused to suffer emotional distress as a result of the Defendant's conduct which includes loss of sleep, pain and suffering, loss of appetite, social anxiety, anxiety in the workplace, lethargy, crying, and depressed mood.

**COUNT FIVE:  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

1-92.  Paragraphs 1 through 92 of Count One are repeated and re-alleged as if set forth fully in this Count Five.

93.    Defendant knew or should have known that its conduct in subjecting the Ms. Krodel to sexual harassment, hostile work environment and retaliation and was an unreasonable risk of causing severe emotional distress to Ms. Krodel and that such distress might result in illness or bodily harm.

94.    Ms. Krodel's emotional distress was foreseeable and reasonable in light of the Defendant's conduct.

95.    Ms. Krodel's emotional distress was severe enough that it caused illness for which she sought medical treatment.

96.    Defendant's conduct in failing to address the reported retaliation by forcing her to endure the hostile work environment was the cause of Ms. Krodel's distress.

97.    As a direct and proximate result of the Defendant's acts and/or omissions, Ms. Krodel has suffered severe emotional distress.

98.    Ms. Krodel has been caused to suffer damages in the form of lost wages and benefits, future pay and benefits, emotional distress, non-economic damages and attorneys' fees.

WHEREFORE, Ms. Krodel claims judgment against Defendant, and damages and equitable relief as follows:

1.    Award compensatory and punitive damages as allowed by statute;
2.    Non-economic Damages;
3.    Award attorney's fees and costs, including expert witness expenses;
4.    Interest as allowed by statute;
5.    Grant Plaintiff a trial by jury; and
6.    Such other and further relief as may be just and equitable.

PLAINTIFF
MARGARET KRODEL

By:  /s/  Kristi Dawn Kelly
Kristi D. Kelly (ct23970)
Suisman, Shapiro, Wool, Brennan, Gray
& Greenberg, P.C.
2 Union Plaza, Suite 200
P.O. Box 1591
New London, CT 06320
Phone:  860-271-2223
Facsimile:  860-442-0495
kkelly@sswbgg.com

## CERTIFICATE OF SERVICE

This is to certify that on the 22ⁿᵈ day of October, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Javier F. Flores
Dinsmore & Shohl, LLP
101 Arch Street, Suite 1800
Boston, MA 02110
Javier.Flores@dinsmore.com

Allison L. Goico
Dinsmore & Shohl, LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
Allison.goico@dinsmore.com

Zachary J. Weber
Dinsmore & Shohl, LLP
255 East Fifth Street, Suite 1900
Cincinnati, OH 45202
Zachary.weber@dinsmore.com

/s/  Kristi Dawn Kelly
Kristi D. Kelly, ct 23970